

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 7, 2016

BY ECF, E-MAIL, & HAND DELIVERY

The Honorable Deborah A. Batts
United States District Judge
Southern District of New York
500 Pearl Street, Room 2510
New York, New York  10007

       Re:    United States v. Igor Katsman,
                   S20 12 Cr. 171 (DAB)

Dear Judge Batts:

        The Government respectfully submits this letter in connection with the sentencing of defendant Igor Katsman, which is currently scheduled for May 3, 2016, to advise the Court of the pertinent facts concerning the assistance that Katsman has rendered in the investigation and prosecution of others.  In light of these facts, and assuming that Katsman continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence Katsman in light of the factors set forth in Section 5K1.1(a) of the Guidelines.[1]

Background

A.    The Eastern District Case

        In December 2009, Katsman was charged in the Eastern District of New York in Indictment 09 Cr 865 (FB) (E.D.N.Y.), with seven counts of filing false currency transaction reports ("CTRs"), in violation of Title 31, United States Code, Section 5324.  On March 31, 2010, Katsman was charged in Superseding Indictment 09 Cr. 865 (S-1) (FB) (E.D.N.Y.) (the "EDNY Superseding Indictment") with (i) conspiracy to defraud the Internal Revenue Service ("IRS"), in violation of Title 18, United States Code, Section 371; (ii) conspiracy to commit

---

[1]    The Government is not moving for a downward departure from the applicable Guidelines range at this time, and instead intends to make such a motion at sentencing, solely as a result of the Second Circuit's decision in *United States* v. *Padilla*, 186 F.3d 136, 142 (2d Cir. 1999), which precludes the Government, under the terms of the cooperation agreement involved in this case, from withdrawing a Section 5K1.1 motion once it has been filed.

health care fraud, in violation of Title 18, United States Code, Section 1349; (iii) conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); (iv) conspiracy to file false CTRs, in violation of Title 18, United States Code, Section 371; (v) seven counts of filing false CTRs, in violation of Title 31, United States Code, Section 5324; and (vi) four counts of aggravated identity theft, in violation of Title 18, United States Code, Section 1028A.  The charges arose from a check-cashing operation that Katsman ran in which he (a) filed false CTRs after cashing insurance checks that were paid on fraudulent claims submitted by illegally owned no-fault medical clinics; (b) filed false CTRs after cashing checks from the owner of a medical supply company to permit the business owner to avoid declaring income to the IRS; and (c) purchased identifying information from Russian and Eastern European students that Katsman used to file the false CTRs.

On November 17, 2010, Katsman pleaded guilty, pursuant to a plea agreement, to Counts One, Four, and Twelve of the EDNY Superseding Indictment.  Count One charged the defendant with conspiring to defraud the IRS, in violation of Title 18, United States Code, Section 371. Count Four charged the defendant with conspiring to file false CTRs, in violation of Title 18, United States Code, Section 371. Count Twelve charged the defendant with aggravated identity theft, in violation of Title 18, United States Code, Section 1028A.

Prior to sentencing, the United States Pretrial Services Office ("Pretrial Services") filed a violation report alleging that Katsman had been cashing checks while out on bail. Katsman acknowledged that he had cashed checks in violation of the terms of his pretrial release, but argued that the conduct was not criminal.

At the January 6, 2012 sentencing, the United States Probation Department ("Probation Department") recommended that Katsman's Sentencing Guidelines range be increased by four levels for a leadership role enhancement, which was not included in the plea agreement.  The U.S. Attorney's Office for the Eastern District ("USAO EDNY") agreed that the leadership role enhancement could apply and further asserted that a sentence of 84 months' imprisonment, as recommended by the Probation Department (but higher than the agreed upon Guidelines range in the plea agreement), was a reasonable sentence.  The Honorable Frederic Block, to whom this case was then assigned, ultimately sentenced Katsman to 84 months' imprisonment — 60 month concurrent sentences on the conspiracy charges and a consecutive sentence of 24 months on the aggravated identity theft charge.

Thereafter, Katsman moved to withdraw his plea, or in the alternative to be resentenced, based upon the USAO EDNY's violation of his plea agreement by advocating for a specific sentence.  Judge Block denied the motion to withdraw Katsman's plea but granted the motion for resentencing, and the case was reassigned to The Honorable Sterling Johnson, Jr.  In the interim, Katsman had been violated again by Pretrial Services.  The basis for this violation was Katsman's creation of a Facebook page on which he posted a photograph of a witness who had cooperated against him alongside a picture of a rodent.  Katsman wrote on the Facebook page: "Isn't it good to be a rat," and sent invitations to the cooperating witness's friends to view the page.  The USAO EDNY moved to remand Katsman in advance of his resentencing on the basis of the Facebook incident, and the Court granted that motion.

Subsequently, the USAO EDNY asserted that Katsman's aforesaid post-plea misconduct freed the Government from its obligation under the plea agreement not to advocate for a sentence within or above the Sentencing Guidelines range contained in that agreement. By written decision dated November 27, 2012, Judge Johnson agreed with the USAO EDNY's assertion. On November 30, 2012, Judge Johnson resentenced Katsman to a term of 120 months' imprisonment, which he is currently serving. Katsman has served approximately 46 months thus far.

B.     The Southern District Case and the Rule 35-Cooperation Agreement

In 2012, the United States Attorney's Office for the Southern District of New York charged Mikhail Zemlyansky and Michael Danilovich, among more than 30 defendants, in Indictment 12 Cr. 171 (JPO/DAB) with operating a racketeering enterprise that carried out the largest no-fault automobile insurance fraud scheme ever charged. From 2007 through 2012, the organization, which was led by Zemlyansky and Danilovich, defrauded automobile insurance companies of more than $100 million by, among other things, operating medical clinics that provided, and billed insurance companies for, unnecessary and excessive medical treatments under New York's no-fault insurance law. The organization fraudulently owned and controlled more than a dozen medical professional corporations ("PCs") — including no-fault medical clinics, MRI offices, and acupuncture and chiropractic PCs — by paying licensed medical professionals to fraudulently use their licenses in order to incorporate the PCs. Zemlyansky, Danilovich, and their co-conspirators also paid kickbacks of thousands of dollars to "runners" to recruit patients to receive the same battery of tests and treatments at their clinics, and received kickbacks from other co-conspirators for referring patients for additional unnecessary treatments. All told, the organization billed insurance companies for more than $200 million in fraudulent medical treatments.

In the fall of 2013, Zemlyansky and Danilovich went to trial before The Honorable J. Paul Oetken. In advance of trial, the Federal Bureau of Investigation ("FBI") approached Katsman in prison about potentially cooperating with the Government. Thereafter, the Government and the FBI held preliminary discussions with Katsman about the possibility of cooperating against Zemlyansky and Danilovich, including two cursory proffer sessions in late 2013, but Katsman was not signed up as a cooperator at the time and did not testify at trial. The jury acquitted Zemlyansky of all but the RICO conspiracy charge, on which it hung, and hung on all charges as to Danilovich. A mistrial was declared as to both defendants.

In 2014, a grand jury in the Southern District handed up a Superseding Indictment that charged Zemlyansky and Danilovich with, among other crimes, an expanded RICO conspiracy charge that included the same predicate acts previously alleged in that count as well as additional predicate acts related to securities fraud, including an investment fraud scheme called Lyons Ward & Associates ("Lyons Ward"), which stole approximately $7 million from investors between late 2007 and early 2009. Both Zemlyansky and Danilovich were also charged with five substantive counts related to the Lyons Ward scheme.

In advance of the 2015 re-trial of Zemlyansky and Danilovich, the Government and the FBI conducted additional proffer sessions with Katsman, during which Katsman

reiterated his knowledge about Zemlyansky's and Danilovich's no-fault insurance fraud scheme and corresponding money laundering activity, as well as his knowledge of, and involvement in, the Lyons Ward investment fraud scheme, another investment fraud scheme called the Rockford Group, and other criminal activity with Zemlyansky and Danilovich. On February 11, 2015, Katsman pleaded guilty in the Southern District, pursuant to a joint EDNY-SDNY Rule 35-Cooperation Agreement, to Superseding Information S21 12 Cr. 171 (DAB) (S.D.N.Y) (the "SDNY Information").

The SDNY Information charged Katsman in nine counts. Count One charged Katsman with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). Counts Two and Three each charged Katsman with money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1). Count Four charged Katsman with money laundering, in violation of Title 18, United States Code, Section 1957. Counts Five and Six each charged Katsman with conspiracy to commit health care fraud and mail fraud, in violation of Title 18, United States Code, Section 1349. Count Seven charged Katsman with conspiracy to operate an illegal gambling business, in violation of Title 18, United States Code, Section 371. Counts Eight and Nine each charged Katsman with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371.

Of note, Katsman voluntarily admitted his involvement in the conduct underlying the SDNY Information and then pled guilty, as a requirement of entering into the joint EDNY-SDNY Rule 35-Cooperation Agreement.

Cooperation

A.   Katsman's Information

During numerous proffer sessions, Katsman has been truthful and forthright about his extensive involvement in various uncharged criminal conduct, much of which involved Mikhail Zemlyansky and Michael Danilovich, who were charged in the Southern District, and some (but not all) of which included the conduct that gave rise to that case.

*First*, Katsman admitted that he illegally owned various medical clinics between 1998 and 2001. Between approximately 1998 and 1999, Katsman owned a fraudulent no-fault clinic in Brooklyn, and used a management company called White Forest Management as a shell company to extract the profits from the no-fault clinic. Between 1999 and 2000, Katsman also owned a fraudulent no-fault clinic in Buffalo. And in 2001, Katsman illegally owned a PC that provided psychiatric services for no-fault patients and paid kickbacks for patient referrals from other no-fault clinics.

*Second*, Katsman admitted to engaging in various forms of money laundering and illegal check cashing between approximately 2002 and 2012. Katsman admitted that he worked as a broker to cash checks from approximately 2002 to 2004 through shell companies called Wholesale Connections, Republic Capital, and United Factoring. As a broker, Katsman cashed insurance checks for no-fault clinic owners as well as some checks for laundered proceeds of securities fraud boiler rooms. Katsman believed the checks were obtained by fraud based on his

own experience in the no-fault business and his understanding that no-fault medical fraud mills typically used check cashers because they could not make large cash withdrawals from the PC bank accounts without arousing the suspicion of insurance companies and law enforcement. Katsman generally charged a percentage of the face amount of the checks cashed. Also, from approximately 2003 to 2004, Katsman laundered approximately $1.2 million to $1.5 million in proceeds from an investment fraud scheme operated by Yevgeny Shvartsshteyn, a/k/a "Gino," and Igor Levin, a/k/a "Tiger."

Katsman admitted that from approximately 2005 to 2011, he again used check cashers in New Jersey and Pennsylvania to illegally cash checks. At these businesses, Katsman cashed checks for no-fault clinic owners and investment fraud schemes. In addition, Katsman laundered money by wiring illegal proceeds overseas through Eastern European bank accounts and then back to shell companies in the United States that Katsman controlled, from which he was able either to wire money to his co-conspirators or cash checks from the shell companies at check cashers. In connection with the check cashing businesses and shell companies that Katsman used, he purchased identifying information from Russian and Eastern European students who were visiting the United States, and used this information to set up the shell companies. Katsman also used the corporate and individual information to file false CTRs in connection with checks that he cashed, the conduct underlying the EDNY Superseding Indictment.

From 2005 to 2006, Katsman laundered approximately $1 to $2 million for Gino and Tiger in connection with an investment fraud scheme called "R&R Capital" (known to the Government as AR Capital Group), both by cashing checks and by wiring money overseas and back to the United States. Katsman also laundered millions of dollars on behalf of Zemlyansky, Danilovich, and others in connection with securities fraud schemes that Zemlyansky and Danilovich operated, including the Lyons Ward scheme and the Rockford Group scheme. Katsman provided wire instructions to Danilovich for bank accounts in Latvia, which were controlled by Katsman's associates. These associates then wired the money to various other overseas accounts and then back to one of Katsman's bank accounts in the United States. Katsman then provided the clean cash to Zemlyansky and Danilovich in New York. Katsman estimated that he laundered approximately $3.5 million for Zemlyansky and Danilovich in connection with the Lyons Ward and Rockford Group schemes. Katsman charged a fee of between approximately 8 to 15% to launder the illegal proceeds. The FBI's review of Lyons Ward, Rockford Group, and certain Latvian bank accounts — which Katsman did not see as of at least June 2012 when he was incarcerated — corroborate this flow of funds and amounts.

As noted above, Katsman was arrested in the Eastern District in 2009. While he was on bail, he cashed checks for Zemlyansky, Danilovich, and other no-fault clinic owners. Katsman explained that he took insurance checks from Zemlyansky and Danilovich and cashed those checks at a check cashing store in New Jersey in exchange for a 10% fee. Katsman estimated that he cashed approximately $600,000 in checks in 2010 and 2011 for Zemlyansky and Danilovich while Katsman was on bail. Katsman said that he also laundered approximately $200,000 for Zemlyansky and Danilovich by wiring the money overseas using a shell company called Montclair Capital. Katsman instructed Zemlyansky and Danilovich to issue checks to Montclair Capital. Katsman then wired the money from the Montclair Capital bank account to

Prague, Czech Republic, to launder it. Katsman then provided the clean cash to Zemlyansky and Danilovich in New York. The FBI's review of Montclair Capital's bank records corroborates Katsman's account.

*Third*, in approximately 2007 and again in 2011 and 2012 while he was on bail, Katsman admitted that he conspired to commit securities fraud. In 2007, Katsman, Gino, and Tiger agreed to set up an investment fraud scheme. In furtherance of the scheme, Katsman opened up a shell company and bank account. The investment scheme never operated, however. In 2011, Danilovich proposed that he and Katsman start another investment fraud scheme called Baron & Caplan Association ("Baron & Caplan"). In furtherance of that scheme, Katsman enlisted a straw owner to open a corporation in Florida and a bank account. Katsman also intended to launder the proceeds of the fraud through Latvia, as he previously had done in the Lyons Ward and Rockford Group schemes. Katsman and Danilovich agreed that Katsman would receive approximately 35% to 45% of the profits. Ultimately, Danilovich and Katsman did not complete the scheme, although plans and discussions about this operation continued even after Danilovich was arrested in February 2012 and after Katsman was remanded in his Eastern District case.

*Fourth*, Katsman admitted that in approximately 2011 and 2012, while he was on bail in his Eastern District case, he, Danilovich, and Zemlyansky engaged in a scheme to defraud health insurers by filing false claims for dental work that was never performed. Katsman paid an individual to incorporate a dental company and open a bank account, which was then turned over to Katsman. Danilovich and Zemlyansky obtained information about real dental patients, and they used this patient information to cause bogus dental insurance claims to be filed with health insurers for services that were never provided. In fact, there was no dental office; rather, Katsman, Danilovich, and Zemlyansky obtained a "virtual office" in Manhattan where checks from the insurers were mailed. As in the earlier schemes, Katsman then wired the fraudulent proceeds overseas to launder them, and provided the clean cash to Danilovich and Zemlyansky in New York. The scheme lasted several months and netted approximately $120,000, the first $50,000 of which Katsman received, and the remainder of which was divided among Danilovich, Zemlyansky, and Katsman.

*Fifth*, Katsman acknowledged that in approximately 2011, he, Danilovich, and Zemlyansky conspired to operate an illegal poker game at an apartment they rented in downtown Manhattan. They signed a lease for the apartment, but ultimately the high-stakes poker game did not get up and running. Katsman identified the location of this apartment to the FBI, while on a "take out" order.

*Finally*, Katsman has acknowledged the harm he might have caused with the "rat" Facebook page and has further expressed his regret for this conduct.

B.     Katsman's Testimony

Katsman testified at two related, multi-week RICO conspiracy, securities fraud, no-fault insurance fraud, and money laundering trials for the Government. The trial of Mikhail Zemlyansky ran for four weeks in February and March 2015, and resulted in Zemlyansky's

conviction on all six counts.  The trial of Michael Danilovich ran for five weeks from late September through early November 2015, and resulted in Danilovich's conviction on all sixteen counts.  In each case, Katsman was the most central cooperating witness and testified for multiple days, more than any other Government witness.  Zemlyansky and Danilovich were significant Russian organized crime targets who perpetrated a massive no-fault insurance fraud of over $100 million and investment frauds of over $20 million.  Katsman's testimony was a compelling and important aspect of the Government's proof against Zemlyansky and Danilovich.  Katsman's testimony was relevant to all counts against both defendants; in fact, as to some of the charges, Katsman's was the only testimony admitted pertaining to the alleged conduct of the defendants.  The importance of Katsman's testimony, which the jury clearly credited, cannot be understated.

*First*, Katsman provided critical testimony about the extensive money laundering that he conducted for Zemlyansky and Danilovich, including the use of check cashers and overseas wires.  Katsman was the primary money launderer for Zemlyansky's and Danilovich's enterprise, laundering millions of dollars related to their investment fraud schemes and no-fault insurance fraud scheme.  Katsman also corroborated the testimony of other cooperating witnesses who testified that Zemlyansky and Danilovich used check cashers to extract the proceeds from their illegal no-fault clinics and PCs.

*Second*, Katsman provided helpful background testimony about the use of shell management companies used by non-medical-professional PC owners, like Zemlyansky and Danilovich, to extract the proceeds from the PCs as part of the no-fault scheme.  As noted above, Katsman used such a shell management company called White Mountain when he was operating no-fault clinics in the late 1990s and early 2000s.  The use of these types of management companies to paper over the fraud was an essential part of Zemlyansky's and Danilovich's defense, which Katsman's testimony helped undercut.

*Third*, Katsman testified in significant detail about the investment frauds operated by Zemlyansky and Danilovich between 2007 and 2012, including Lyons Ward, the Rockford Group, and Baron & Caplan.  Katsman also assisted the FBI in recovering a ledger that Katsman used in 2009 to keep track of his money laundering, including for the Rockford Group scheme, which was important corroborating documentary evidence introduced at both trials.  Significantly, Katsman was one of only two cooperating witnesses who testified about Zemlyansky's and Danilovich's involvement in the Lyons Ward and Rockford Group schemes — in fact, Katsman was the only witness who provided direct evidence of their involvement in the Rockford Group — and Katsman was the only witness who testified about Danilovich's involvement in the Baron & Caplan scheme.  The jury convicted Zemlyansky and Danilovich on all counts relating to those schemes.

*Fourth*, Katsman testified that he, Zemlyansky, and Danilovich conspired to set up an illegal poker room in 2011.  Again, the jury found that this RICO predicate was proved.

*Fifth*, Katsman's cooperation is particularly significant in light of his background and relationships with the trial defendants.  While it is always difficult for cooperating witnesses to testify against their coconspirators, the Government's experience has generally been that

individuals involved in Russian organized crime are hesitant to cooperate. The Russian community in New York is very close knit, and thus witnesses face the reality that they will be effectively exiled from this community. Katsman's cooperation is thus unusual and difficult and should be further credited for this reason.

Specifically, Mikhail Zemlyansky was one of Katsman's closest friends. They live five minutes from each other on Long Island. Their wives are friends and their children go to the same school; in fact, Zemlyansky's wife was Katsman's real estate agent. At Zemlyansky's trial, it was apparent that Katsman had great difficulty testifying against his close friend, giving short answers and not volunteering certain inculpatory information that he had previously told the Government during proffer sessions. While this was disconcerting, it was somewhat understandable given the impact it would have on his family in the Russian community. Not only was Zemlyansky in the courtroom, of course, but so was his wife and members of the Russian organized crime community, some of whom were close to Katsman.

Because Katsman was such a vital cooperator, he was required to meet with the Government on dozens of occasions. Since Katsman was in custody, this often required him to wake up very early in the morning and occasionally stay very late into the evening and miss meals. However, there were a few instances where Katsman declined to be produced for meetings, resulting in their being cancelled or requiring agents to use "take out" orders, which unnecessarily wasted time and resources. While this inconvenienced the Government, it did not in the end affect the quality and effectiveness of Katsman's testimony.

Discussion

Section 5K1.1(a) of the Guidelines provides that the Court is to consider the following five, non-exclusive factors in deciding upon "[t]he appropriate reduction" from the otherwise applicable sentencing range. The application of each of those factors to Katsman's cooperation is set forth below.

1. *"[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1)).* As noted above, Katsman provided powerful and direct testimony at Zemlyansky's trial and Danilovich's trial about all aspects of their crimes. While the Government called over two dozen witnesses at each of these weeks-long trials, Katsman was the most important witness in each. Katsman's testimony was relevant to all counts against both defendants; in fact, as to some of the charges, Katsman's was the only testimony admitted pertaining to the alleged conduct of the defendants. The significance of Katsman's testimony, which the jury clearly credited, cannot be understated.

2. *"[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2)).* The Government has never had any reason to doubt that the information provided by Katsman was truthful, complete, and reliable. In fact, much of the information and testimony provided by Katsman was corroborated by other documentary evidence and the testimony of other witnesses. Although some of Katsman's testimony against Zemlyansky was not as fulsome as the information he had previously provided to the Government, the Government does not believe this testimony was untruthful.

3. *"[N]ature and extent"* of assistance *(§ 5K1.1(a)(3))*. As noted above, Katsman testified at both Zemlyansky's and Danilovich's trials. The nature and extent of his assistance cannot be overstated.

4. *"[A]ny injury suffered, or any danger or risk of injury to the defendant or his family"* resulting from assistance *(§ 5K1.1(a)(4))*. The Government is not aware of any injury suffered by Katsman or his family as a result of his cooperation. Whether he was threatened or not, however, it is inherently risky for a criminal defendant to cooperate with the Government, particularly in organized crime cases. Katsman believes that, upon his release, he will need to relocate because of the reaction of his community to his cooperation.

5. *"[T]imeliness"* of assistance *(§ 5K1.1(a)(5))*. As noted above, the USAO EDNY initially approached Katsman about cooperating in connection with its investigation, and Katsman declined to do so. The FBI approached Katsman in mid-2013 while he was serving his 120-month sentence to determine whether he would be interested in cooperating in connecting with the Zemlyansky-Danilovich investigation and trial in this District. Katsman indicated that he was interested in cooperating to secure a Rule 35 motion in his Eastern District case. That process resulted in the joint EDNY-SDNY Rule 35-Cooperation Agreement.

## Conclusion

For the reasons stated above, the Government's current intention is to request at sentencing that the Court sentence Katsman in light of the factors set forth in Section 5K1.1(a) of the Sentencing Guidelines.[2]

        Respectfully submitted,

        PREET BHARARA
        United States Attorney

By: /s/
        Joshua A. Naftalis
        Assistant United States Attorney
        (212) 637-2310

cc: Jonathan Edelstein, Esq.
    Jill Jefferies, U.S. Probation Department

---

[2] On January 20, 2016, the U.S. Attorney's Offices for the Southern and Eastern Districts made a joint Rule 35 motion before Judge Johnson in the Eastern District. That motion has been pending since January 29, 2016.